**DOUG HARTLEY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 81–7368, 81–7457.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1982.

Decided Feb. 17, 1982.

Richard M. Freeman, San Diego, Cal., argued, for petitioner; Luce, Forward, Hamilton & Scripps, San Diego, Cal., Levy & Goldman, Los Angeles, Cal., on brief.

Linda Dreeben, N.L.R.B., Washington, D. C., argued, for respondent; Judith A. Dowd, N.L.R.B., Washington, D. C., on brief.

Before CHOY, KENNEDY, and FARRIS, Circuit Judges.

KENNEDY, Circuit Judge:

Petitioner Doug Hartley, Inc. ("the Company") seeks review of an NLRB order. The NLRB found that the Company com-mitted an unfair labor practice under sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1976),[1] in discharging a particular crew. The NLRB cross-appeals for enforcement of its order. We find, as the Company urges, that no substantial evidence supports the Board's decision in this case. Therefore, we decline to enforce the order of the Board.

The material facts can be briefly stated. The issue before the Administrative Law Judge and the Board was the motive for the Company's discharge of a crew on August 5, 1979. The Company had been working for several months as a construction subcon-tractor, installing doors and windows. One Seymour supervised the crew who did the actual installation. This crew, by all accounts, performed work of extremely poor quality. On August 3, 1979, Doug Hartley, owner of the Company, was told that if the crew's mistakes at one particular jobsite were not remedied by Monday, August 6, the Company would lose the subcon-tract. Hartley therefore ordered Seymour to have the problems fixed over the week-end. When Hartley found out, on August 5, that the crew had not appeared to per-form the work, he immediately discharged the entire crew.

Upon a complaint by the union that this discharge was the result of the signing of union authorization cards by a majority of Seymour's crew, a hearing was held before an NLRB Administrative Law Judge. Hartley denied knowledge of any union ac-tivity by the members of the crew, but the ALJ found that Seymour's knowledge on the point should be imputed to Hartley.

The ALJ applied the correct legal analy-sis, described in NLRB v. Nevis Industries, Inc., 647 F.2d 905, 909 (9th Cir. 1981). In Nevis Industries, we approved the NLRB's new approach to dual motive discharge cases, as set out in Wright Line, 251 NLRB

---

1. The statute states in relevant part:
   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce em-ployees in the exercise of the rights guaran-teed in section 157 of this title;

. . . .
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
   29 U.S.C. § 158(a) (1976).

No. 150, 105 LRRM 1169 (1980), *enforced, NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981). Whereas previously, the General Counsel bore the burden of proving that protected union activity was the "dominant" or "moving" cause for the discharge, under *Wright Line*, and *Nevis Industries*, the General Counsel bears only the initial burden of showing that protected activity was "a motivating factor" in the discharge. The burden then shifts to the employer to prove that he would have discharged the employee absent the protected activity.

In this case, the ALJ found that a prima facie case against the company had been established, i.e., that the General Counsel had shown the union activities of the employees were "a motivating factor" in their discharge. The Company then bore the burden of proving that the discharges would have been made in the absence of the employees' participation in any protected activity. The ALJ found that the Company met this burden by proving the reason for the firing was the crew's poor performance record in general, and particularly its failure to show up at the worksite on the August 3 weekend. The poor quality of work before this incident, and this incident, were fully documented at the hearing. Two of the employees did testify that Hartley told them he was firing them because of their union activities, but the ALJ explicitly discredited this testimony, describing it as "nothing more than a story fabricated by these two witnesses." The ALJ therefore found that Hartley had "more than demonstrated on this record that the employees would have been discharged in any event."

The Board reversed, by a 2–1 vote, "inferring" from the evidence that the admittedly poor performance of the crew was only a pretext. If the employees had been discharged and some had not been rehired, it is apparent that the Board would not have reversed the ALJ. In this case, a majority of the work crew were rehired soon after the discharge. Dissatisfied by what it called appellant's "shifting and conflicting explanations" for the selective rehiring, the NLRB saw the discharge and rehiring as a "blatant" demonstration of the Company's "raw economic leverage."

We realize that the issue is whether substantial evidence supports the Board, even in a case like this where the NLRB is divided. Nonetheless, our scrutiny is more searching when the Board has reversed an ALJ. *Kallman v. NLRB*, 640 F.2d 1094, 1098 & n.7 (9th Cir. 1981); *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924, 928 (9th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980).

The Board claims that it inferred different motives than the ALJ did from the circumstances and did not overrule his credibility findings. There is some merit to this claim, although of necessity the NLRB's decision required discrediting Hartley's testimony, which the ALJ apparently believed. In any case, the reasons stated for the Board's inferences are not substantial. We note that the ALJ, who was far more intimately acquainted with the facts of the case, disagreed. The NLRB's conceded expertise does not mean that we will approve any finding, even if founded only in speculation. *See NLRB v. Four Winds Industries, Inc.*, 530 F.2d 75, 79–80 (9th Cir. 1976); *cf. TRW, Inc. v. NLRB*, 654 F.2d 307 (5th Cir. 1981).

The NLRB argues that the actions here show "raw economic leverage." True, every discharge, and every hiring does, but only those made from antiunion motive are reached by labor law. This is not the case of a calculated action in the midst of a bitter union campaign. We have here an immediate reaction to a blatant example of incompetence or insubordination. An employer is entitled to fire incompetent workers, and if that is a substantial motive for the discharge there is no unfair labor practice. *See L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337 (9th Cir. 1980).

The Board was persuaded by the selective rehiring that the employee's poor performance was a pretext. The Board, however, did not assert that the discharge and rehiring were designed to eliminate pro-union employees. The Board, instead, saw the

action as a demonstration of raw market power to cower all its employees. The NLRB found that Hartley's explanations for the rehiring were "shifting and conflicting." The three explanations, however, all of which Hartley still asserts, are consistent. The employees' poor performance, an understanding that if the crew's supervisor were terminated the entire crew would be, and Hartley's unwillingness to leave even an inept supervisor without a means of earning a living may all have coexisted. His eventual decision to rehire the more inexperienced members of the crew is fully consistent with his testimony at the hearing.

The existence of multiple, consistent, legitimate reasons for a decision challenged under the labor laws does not aid the inference of illicit motive. Nor are the reasons given for Hartley's actions so implausible that we are led to believe only an improper motive could explain those actions. *Cf. Nevis Industries*, 647 F.2d at 910.

The weaker a prima facie case against an employer under *Wright Line*, the easier for an employer to meet his burden, at the second stage, of proving that the discharges would have occurred regardless of the protected activity. The ALJ found Hartley knew about the employee's union activities, and that one of his motivations was antiunion animus, but neither finding was based on a strong factual showing. This weakness supported the ALJ's conclusion that even if no unionizing had been involved, Hartley would have acted in the same way.

Since, on the record as a whole, we cannot find substantial evidence supporting the decision of the Board, we grant the petition and refuse enforcement.

PETITION GRANTED; ENFORCEMENT DENIED.